BARTLETT, LEADER-PICONE & YOUNG, LLP
MALCOLM LEADER-PICONE (STATE BAR NO. 104620)
2201 BROADWAY, SUITE 803
OAKLAND, CA 94612
TELEPHONE: (510) 444-2404
FACSIMILE: (510) 444-1291

Attorneys for Creditors
DAVID MENDELSOHN, LARRY GINSBURG,
and HAROLD SILEN

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSÉ DIVISION

| | |
|---|---|
| In re:<br><br>EXCEL INNOVATIONS, INC.,<br><br>Debtor. | No. 04-53874-ASW 11<br><br>Chapter 11<br><br>**CREDITORS' OBJECTION TO THE FIRST INTERIM APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES BY ATTORNEY FOR DEBTOR.**<br><br>Date: December 7, 2010<br>Time: 1:15 p.m.<br>Dept.: 3020<br><br>**HON. ARTHUR S. WEISSBRODT** |

<u>**OBJECTION TO THE FIRST INTERIM APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES**</u>

These creditors files this objection to Campeau Goodsell Smith's interim application for compensation and expense reimbursement ("Application") as follows, and hereby join in the objections filed by the U.S. Trustee in all respects:

I. <u>**COMPENSATION SOUGHT BY CAMPEAU GOODSELL SMITH.**</u>

In its Application, Campeau Goodsell Smith seeks approval of fees, on an interim basis, in the amount of $953,409, plus 11,589.27 in costs. For the reasons set forth below, the creditors hereby object.

## II.     INTRODUCTION.

Counsel for the debtor has managed to keep this bankruptcy alive for an astonishing seven years, when there was only one asset realistically available to fund the payment of claims, the deposit with U.S. Bank. Rather than quickly and expeditiously resolve the dispute over those funds, debtor's counsel dragged out the case unnecessarily to the point where counsel's fee exceed the amount recovered from the U.S. Bank funds.

Not only is the fee application technically defective, as detailed below, but there is little that counsel has done in the case that has benefited either the creditors or the estate. Consequently, these creditors object to this outrageous fee application and ask the Court to limit counsel to those fees actually and necessarily incurred to mediate and resolve the turnover case.

## III.     OBJECTIONS.

### A.     Interim Fee Application Fails to Comply With the Court's Guidelines

The Court's promulgated *Guidelines for Compensation of Professionals* ("*Guidelines*") provides, in relevant part, that:

> The professional may use reasonable discretion in defining projects for this purpose, provided that the application provides meaningful guidance to the Court as to the complexity and difficulty of the task, the professional's efficiency, and the results achieved. The number of billing categories created should take account of the total amount of fees and expenses sought in the case. Thus, for example, an application totaling $100,000 should generally be broken into more categories than an application totaling $10,000, even if the nature of the work represented in the two applications is otherwise similar.
>
> There is no minimum amount necessary to justify the creation of a new billing category. The **maximum amount** that should be included in a single category should generally be **$20,000**. This cap may be exceeded where further breakdown is **impractical** (e.g., courtroom time in a long trial). Generally, each category should contain less than $20,000. Miscellaneous items may be included in a category such as *case administration*, but such a category should not generally represent more than 15% of the fee request.
>
> Work in a main case should be broken into categories appropriate to the size, chapter, and complexity of the case, and the role of the professional. Generally, each adversary proceeding should be set forth in a separate category. Within each adversary proceeding, subcategories should be created for *pleadings*, *discovery*, *motions*, and *trial*. In complex adversary proceedings, additional categories may be appropriate.
>
> With respect to each project or task, the number of hours spent, the results obtained, and the amount of compensation and expenses requested should be set forth at the conclusion of the discussion of that project or task. Please also note the requirement in Guideline 11 relating to time records by project. (Emphasis Added)

Contrary to CGS' statement that it has adopted the *Guidelines for Compensation of Professionals* ("*Guidelines*") issued by the Bankruptcy Court for the Northern District of California, as seen below, CGS' Application falls short of meeting the Court's *Guidelines*.

### 1. Case Administration

CGS claims to have expended time in this category at a cost to the estate of $149,217.00. The services rendered in this category included but was not limited to the following sub-categories: communications, debtor relief from stay, engagement of professionals, identification of assets, corporate governance and motion to convert case.

CGS' Application fails to comply with the Court's *Guidelines* in a number of ways. The amount requested in this category exceeds the maximum cap amount of $20,000. While the *Guidelines* allows for "the cap" to be exceeded, CGS fails to show how a further breakdown is impractical under the circumstances. Furthermore, CGS fails to show the number of hours spent and the results obtained with respect to each subcategory. For example, a very cursory review of CGS' time records indicate that approximately $5,440 was for time spent on engagement of professionals and $24,650 was for time spent on opposing various motions to convert case. It should be noted that the repeated motions to convert the case were based upon the debtor's repeated failure to timely file operating reports and pay fees; all of which are derelictions in counsel's administrative activities. Therefore, the latter amount of $24,650 should be rejected out of hand.

CGS' failure to comply with the *Guidelines* does not provide the Court and these Creditors meaningful guidance as to the complexity and difficulty of the task, CGS's efficiency, and the results achieved. More importantly, the Court and these Creditors are left to guess and "figure out" whether the time expended by CGS was reasonable in relations to the results achieved in each subcategory.

### 2. Stock Proceeds Turnover

CGS claims to have expended time in this category at a cost to the estate of $179,260.00.

CGS' Application fails to comply with the Court's *Guidelines* in a number of ways. The amount requested in this category exceeds the maximum cap amount of $20,000. The fact that the

Guidelines allows for "the cap" to be exceeded, CGS fails to show how a further breakdown is impractical under the circumstances. Furthermore, as the *Guidelines* suggests, subcategories should be created for pleadings, discovery, motion and trial. CGS' Application fails in this regard.

CGS' failure to comply with the *Guidelines* does not provide the Court and these Creditors meaningful guidance as to the complexity and difficulty of the task, CGS's efficiency, and the results achieved. More importantly, the Court and these Creditors are left to guess and "figure out" whether the time expended by CGS was reasonable in relations to the results achieved in each subcategory.

What is known about this category, based on a very cursory review of CGS' time record, is that approximately $72,620.00 was billed for services relating to the debtor's summary judgment motion, a motion which the Court denied. ( See *Application*, 6:19) Not only is that an outrageous amount to bill for a summary judgment motion, but to bring one without merit and charge that much is unconscionable.

### 3. "SLAPP" Litigation

CGS claims to have expended time in this category at a cost to the estate of $28,540.00.

CGS' Application fails to comply with the Court's *Guidelines* in a number of ways. Like other categories, the amount requested in this category exceeds the maximum cap amount of $20,000. The fact that the Guidelines allows for "the cap" to be exceeded, CGS fails to show how a further breakdown is impractical under the circumstances. Furthermore, as the *Guidelines* suggests, subcategories should be created for pleadings, discovery, motion and trial. CGS' Application fails in this regard.

Interestingly, counsel characterizes this group of billings as the "SLAPP" litigation, when a substantial part of the fees were with respect to the Third Party Claim. Any time on the Third Party Claim must be closely scrutinized, because that matter has been stayed for almost its entire duration, due to the fact that the third party defendants asserted their right to insist on arbitration. Hypocritically, counsel asserts that it obtained a stay of the third party action, when the Court stayed the action after the debtor forced repeated litigation of the third party defendants' motion to compel arbitration, which the debtor lost, and the debtor refused to fund an arbitration on the claims.

### 4. District Court Patent Litigation

CGS claims to have expended time in this category at a cost to the estate of $288,842.00.

CGS' Application fails to comply with the Court's *Guidelines* in a number of ways. Like other categories, the amount requested in this category exceeds the maximum cap amount of $20,000. The fact that the Guidelines allows for "the cap" to be exceeded, CGS fails to show how a further breakdown is impractical under the circumstances. Furthermore, as the *Guidelines* suggests, subcategories should be created for pleadings, discovery, motion and trial. CGS' Application fails in this regard.

CGS' failure to comply with the *Guidelines* does not provide the Court and these Creditors meaningful guidance as to the complexity and difficulty of the task, CGS's efficiency, and the results achieved. More importantly, the Court and these Creditors are left to guess and "figure out" whether the time expended by CGS was reasonable in relations to the results achieved in each subcategory.

Considering the fact that the central issue in the patent litigation, ownership of the biometric patents, was decided prior to the filing of the bankruptcy, and everything thereafter was a futile attempt to overturn the District Court's summary judgment ruling on patent ownership, all of these fees should be denied. There was never a reasonable potential for the debtor to overturn the District Court ruling, and counsel should have figured that out, long before preparing a petition for writ of *certiori* in the U.S. Supreme Court. Certainly, the creditors should not have to pay for the frivolous appeals.

Counsel touts its efforts to obtain dismissal of the Indivos/Solidus damage claims, but the fact is that those parties simply make the economic decision not to further prosecute those claims. Counsel's efforts had nothing to do with it.

### 5. Reorganization Plan(s)

CGS claims to have expended time in this category at a cost to the estate of $156,359.00. The services rendered in this category included but was not limited to the following sub-categories: Indivos/Solidus Plan and the Debtor's Plan.

CGS' Application fails to comply with the Court's *Guidelines* in a number of ways. The amount requested in this category exceeds the maximum cap amount of $20,000. The fact that the Guidelines allows for "the cap" to be exceeded, CGS fails to show how a further breakdown is impractical. Furthermore, CGS fails to show the number of hours spent and the results obtained with respect to each subcategory. CGS' failure to comply with the *Guidelines* does not provide the Court and this Creditor meaningful guidance as to the complexity and difficulty of the task, CGS's efficiency, and the results achieved. More importantly, the Court and Creditor are left to guess and "figure out" whether the time expended by CGS was reasonable in relations to the results achieved in each subcategory.

Beyond the technical deficiencies of this category, nothing benefitted the estate or the creditors from counsel's attacks on the Indivos/Solidus plan. That plan, if enacted, would have put $500,000 into the estate six years ago, and would have put actual money in the pockets of creditors. Instead, counsel scuttled that plan, came up with nothing approaching a plan, and stretched the case out for six more years.

### 6. <u>AAA Arbitration</u>

CGS claims to have expended time in this category at a cost to the estate of $117,361.00.

CGS' Application fails to comply with the Court's *Guidelines* in a number of ways. Like other categories, the amount requested in this category exceeds the maximum cap amount of $20,000. The fact that the Guidelines allows for "the cap" to be exceeded, CGS fails to show how a further breakdown is impractical under the circumstances. Furthermore, as the *Guidelines* suggests, subcategories should be created for pleadings, discovery, motion and trial. CGS' Application fails in this regard.

CGS' failure to comply with the *Guidelines* does not provide the Court and these Creditors meaningful guidance as to the complexity and difficulty of the task, CGS's efficiency, and the results achieved. More importantly, the Court and these Creditors are left to guess and "figure out" whether the time expended by CGS is reasonable in relations to the results achieved in each subcategory.

The time expended in this category, by counsel's own characterization was all designed to postpone any finality to the arbitration that commenced prior to the bankruptcy, in which the debtor had already been found to be the alter ego of Ned Hoffman. The only issue remaining the case was damages. Although the arbitration is resolved by the pending settlement, there was no benefit to the estate and creditors by the debtor's obstruction of Indivos/Solidus' attempts to conclude the arbitration. In fact, the debtor could have resolved the turnover proceeding years ago, if it had simply agreed to participate in the arbitration and see it to its conclusion.

### IV. FAILURE TO DEMONSTRATE LIKELY BENEFIT TO THE ESTATE AT TIME SERVICES RENDERED.

With a fund of a million and a half dollars safely locked up in U.S. Bank, debtor's counsel undertook a strategy in this bankruptcy to churn and extend the case for as long it possibly could, with the belief that there would be funds at the end to pay the high cost of that strategy.

In every single category of this fee application, the Applicant attempts to cast in a shiny light what was nothing more than pig-headed, obstructionist, uncompromising, scorched-earth tactics. There was not a single aspect of this case that applicant counsel did not dispute and litigate. No attempt was ever made for seven years to bring closure to the case.

Now, applicant counsel comes before the Court seeking to be rewarded for its failure to resolve the case in seven years, and it seeks more money in fees than counsel have brought into the estate. Before the Court can award counsel fees, it is necessary to determine whether the services were reasonable, actual, and necessary. § 330(a)(1)(A).

Section 330(a)(3) provides in pertinent part:

(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of the services, taking into account all relevant factors, including—

\* \* \*

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title . . . .

Creditors contend that, at the time the services were rendered, applicant counsel was not concerned with moving the case towards completion and the services were not beneficial towards

the goal of completing the case. Rather, the applicant counsel were more focused on enriching themselves and keeping as much of the U.S. Bank funds out of the hands of creditors.

When applicant counsel came into this bankruptcy, they knew that (1) the District Court had determined that Excel did not owner the biometric patents and that Indivos/Solidus owned them; (2) that Excel was about to be sanctioned by the District Court for Hoffman's fabrication of evidence in the summary judgment proceeding; and (3) that the arbitrator had determined that Hoffman was the alter ego of Excel and that Hoffman had breached his settlement, voting trust, and pledge agreements with Indivos by engaging in a reckless litigation spree of more than 13 lawsuits filed in state court through proxies. Yet, despite those overwhelming facts demonstrating that Excel had been hijacked and mismanaged by Hoffman, counsel nonetheless continued Hoffman's quixotic campaign to wage war against Indivos/Solidus, rather than bringing a prudent, reasonable approach to completing the case.

Thus it was that, not until the fees were stacked up even with the possible recovery from the U.S. Bank funds, did applicant counsel consider and agree to mediation of the turnover case.

Consequently, the Court should deny a large portion of the claimed fees, because they do not meet the requirements of section 330. See, *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co.* (*In re Mednet*), 251 B.R. 103, 113 (B.A.P. 9th Cir. 2000), affirming disallowance of fees that were not "necessary" or "reasonably likely to benefit the . . . estate."

As observed by *Matter of Taxman Clothing Company*, 49 F.3d 310 (7th Cir. 1995), as cited in *In re Auto Parts Club*, 224 B.R. 445, 457 (Bankr. S.D. Cal. 1998):

> The result is harsh. But being a creditor and seeing your claim getting eaten by a lawyer is a harsh fate as well. Even after the passage of 11 U.S.C. § 330(a)(1), **bankruptcy is not intended to be a feast for lawyers**. As we read *In re Toney*, 171 B.R. 414, 415 (Bankr.S.D.Fla. 1994), 'absent extraordinary circumstances, **bankruptcy estates should not be consumed by the fees and expenses of court-appointed professionals**.' 49 F.3d at 316; emphasis added.

Thus, in *In re Auto Parts Club*, *supra*, 224 B.R. 445, the bankruptcy court reduced counsel's fees substantially, while noting counsel's "overkill".

Here, too, where the U.S. Trustee has noted that the estate, even with a settlement of $925,000 is administratively insolvent, the Court should exercise its discretion to severely limit the

fees of applicant counsel. These creditors join in the U.S. Trustee's suggestion that the fees be only allowed to the extent of 30% of the application and that the case be converted to a Chapter 7 so that a trustee can apply his or her neutral judgment to the final wrapping up of this case.

Respectfully submitted,

DATED: December 2, 2010.    BARTLETT, LEADER-PICONE & YOUNG, LLP

BY: **/s/ Malcolm Leader-Picone #104620**
MALCOLM LEADER-PICONE
Attorneys for Creditors
DAVID MENDELSOHN, HAROLD SILEN and
LARRY GINSBURG

## PROOF OF SERVICE BY EMAIL AND/OR FIRST CLASS MAIL

I, Malcolm Leader-Picone, declare that:

I am employed in the County of Alameda, California. I am over the age of eighteen years and not a party to the within action. My business address is 2201 Broadway, Suite 803, Oakland, CA 94612. On December 2, 2010, I served the following document(s) entitled:

**CREDITORS' OBJECTION TO THE FIRST INTERIM APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES BY ATTORNEY FOR DEBTOR.**

upon the following person(s) in said action by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at Oakland, California addressed as follows, AND/OR by email at the listed addresses:

| John S. Wesolowski, Esq.<br>Office of the United States Trustee<br>280 South First St., Rm. 268<br>San José, CA 95113<br>john.wesolowski@usdoj.gov | Gregory Charles, Esq.<br>Campeau, Goodsell Smith<br>440 No. 1st Street, Suite 100<br>San Jose, CA 95112<br>gcharles@campeaulaw.com |
|---|---|

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Oakland, California, on December 2, 2010.

**/s/ Malcolm Leader-Picone #104620**
Malcolm Leader-Picone